**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Carl Durham,<br><br>    Plaintiff,<br><br>v.<br><br>MTC Financial Incorporated,<br><br>    Defendant. | No. CV-19-00238-PHX-DLR<br><br>**ORDER** |

Following a January 15, 2019 hearing, the Court issued a minute entry granting Plaintiff Carl Durham's request for a temporary restraining order ("TRO") and enjoining the January 16, 2019 trustee's sale of his home. (Doc. 17.) This written order elaborates on the Court's reasoning.

**I. Factual Background**[1]

When someone borrows money to finance a home, that loan customarily is memorialized in a promissory note, which "is a contract that evidences the loan and the obligor's duty to repay." *Hogan v. Wash. Mut. Bank., N.A.*, 277 P.3d 781, 784 (Ariz. 2012). Repayment of a home loan typically is secured by pledging the home as collateral. This security is called a mortgage, A.R.S. § 33-702, and in Arizona the mortgage often takes the

---

[1] This factual background derives from Plaintiff's verified complaint and accompanying exhibits (Doc. 1-3) and represents the Court's best effort to describe the sequence of events leading to this lawsuit. Where there are holes in the evidence, the Court has endeavored to identify them. Because this order resolves only a request for a TRO, the descriptions contained within it are merely preliminary and subject to change after further factual and legal development.

form of a deed of trust, which transfers legal title to the home to a trustee while leaving the borrower with possession of the property. "The trustee, in turn, holds bare legal title for the beneficiary, who is typically the original lender under the note, . . . for the sole purpose of selling the property if the trustor/borrower defaults on the note." *Steinberger v. McVey ex rel. Cty. of Maricopa*, 318 P.3d 419, 426 (Ariz. Ct. App. 2014). Although generally the promissory note and deed of trust travel together, A.R.S. § 33-817, they "are nonetheless distinct instruments that serve different purposes." *Hogan*, 277 P.3d at 784.

In April 2007, Plaintiff borrowed $182,700 (the "Loan") from National City Bank. Plaintiff's obligation to repay the Loan was evidenced by a promissory note ("Note"), and repayment of the Loan was secured by a second mortgage on Plaintiff's home in the form a deed of trust ("Deed of Trust").[2] If Plaintiff did not make timely payments on the Loan per the terms of the Note, the Deed of Trust authorized the designated trustee, on the lender's behalf, to sell Plaintiff's home to satisfy the unpaid balance. The Deed of Trust identified Plaintiff as the borrower, National City Bank as the lender, and National City Bank, Consumer Loan Services as the trustee. But, as is common in the modern mortgage industry, the identities of the lender and trustee changed over time as the Loan was sold to other financial institutions and those financial institutions, in turn, substituted new trustees under the Deed of Trust. (Doc. 1-3 at 3, 10-15.)

Plaintiff fell behind on Loan payments in late 2010. By that time, the Loan apparently had been acquired by Citigroup Global Markets Realty Corporation ("Citigroup"), and BSI Financial Services, Inc. ("BSI") serviced the loan on Citigroup's behalf.[3] Plaintiff pursued loss mitigation with BSI, which resulted in two distinct agreements: (1) an April 12, 2011 settlement agreement ("Settlement Agreement")

---

[2] Plaintiff submitted a copy of the Deed of Trust with his complaint but did not provide a copy of the Note. Other evidence in the record indicates that the Note exists, however. (Doc. 1-3 at 19 (referring to the existence of the Note separate from the Deed of Trust).)

[3] The record contains no recorded assignment of the Deed of Trust to Citigroup, but the absence of such a record does not mean the assignment did not occur because Arizona law does not require such assignments to be recorded. *See In re Vasquez*, 266 P.3d 1053, 1056-57 (Ariz. 2011); *Zadrozny v. Bank of New York Mellon*, 720 F.3d 1163, 1172 (9th Cir. 2013).

addressing the lien on Plaintiff's home memorialized in the Deed of Trust and (2) a Contingent Compromise Settlement Agreement ("Contingent Compromise") signed by Plaintiff on April 14, 2011, and by BSI (as attorney-in-fact for Citigroup) on April 18, 2011, which addressed Plaintiff's repayment obligations under the Note. (Doc. 1-3 at 3-4, 19-22.)

The Settlement Agreement is not in the record, but the recitals in the Contingent Compromise indicate that the Settlement Agreement exists and provide some clues about its terms. Recital A confirms that Plaintiff borrowed $182,700 from National City Bank in April 2007, that the Loan was memorialized in a Note, and that the Note was secured by a lien on Plaintiff's home as memorialized in the Deed of Trust. Recital B explains that the lien "was released pursuant to the acceptance of a settlement . . ., the terms of which were memorialized in a settlement letter . . . dated April 12, 2011," but that, "[p]ursuant to the terms of the Settlement Agreement," Plaintiff still owed the outstanding balance due on the Note, which at that time had risen to $196,122.93. (Doc. 1-3 at 19.)

The Contingent Compromise addressed this outstanding balance. Per its terms, Plaintiff agreed to pay BSI a lump sum of $10,000 on May 13, 2011, and then to pay another $20,000 (at a 0% interest rate) in monthly installments of $200 beginning on June 1, 2011 and due on the first of each month thereafter. If Plaintiff timely paid these amounts, Citigroup agreed to compromise the amount due on the Note. But if Plaintiff failed to timely pay these amounts, Citigroup had the option to terminate the Contingent Compromise without notice to Plaintiff and to pursue whatever remedies were available to it under the terms of the Note. (Doc. 1-3 at 19-20.)

Thus, it appears that Citigroup released the Deed of Trust on April 12, 2011, at which point Plaintiff's obligation to repay the Loan remained, but possibly became unsecured because Citigroup released the lien that until then had secured repayment. Through the Contingent Compromise, Citigroup agreed to accept $30,000 in full satisfaction of this outstanding, unsecured balance, contingent upon Plaintiff making all payments on schedule. If Plaintiff did not timely make all payments, Citigroup could revert

to the terms of the Note. But the Loan presumably remained unsecured because the Deed of Trust had been released on April 12, 2011, and nothing in the record indicates that termination of the Contingent Compromise also unwound or terminated the Settlement Agreement.[4]

Plaintiff alleges that he made all payments due under the Contingent Compromise, "to the best of [his] knowledge and belief." The record, however, contains little evidence of those payments. Plaintiff submitted a copy of a cashier's check that indicates he timely made the $10,000 lump sum payment. Plaintiff also submitted a bank statement showing that he made a $200 payment to BSI on June 16, 2011, though it is not clear whether this was a late payment for the installment due June 1, 2011, or an early payment for the installment due July 1, 2011. The record contains no documentation of installment payments. (Doc. 1-3 at 4, 24, 44.)

Plaintiff, however, filed for Chapter 7 bankruptcy in November 2011, and he admitted during the January 15, 2019 hearing on his TRO request that he stopped making Contingent Compromise payments by at least that date.[5] BSI was identified as a creditor in Plaintiff's bankruptcy case, and Plaintiff received a Chapter 7 bankruptcy discharge on March 19, 2012. (Doc. 1-3 at 4, 26-27.)

In August 2015, Defendant Trinity Financial Services, LLC ("Trinity") acquired ownership and servicing rights to Plaintiff's Loan via a Corporate Assignment of Deed of Trust.[6] Precisely how Trinity acquired these rights is not entirely clear from the record. National City Bank originated the Loan. At some point, National City Bank merged with PNC Bank N.A. ("PNC"). On August 12, 2010, PNC assigned the Deed of Trust to Dreambuilder Investments, LLC ("Dreambuilder").[7] In April 2011, Plaintiff entered the

---

[4] Other evidence in the record supports this understanding. For example, Plaintiff's TransUnion and Experian credit reports from December 17, 2018 describe the Loan as unsecured. (Doc. 1-3 at 30-33.)

[5] This admission undermines Plaintiff's allegation that he satisfied the repayment requirements of the Contingent Compromise to the best of his knowledge and belief. If Plaintiff knows that he stopped paying by at least November 2011, he presumably knows that he did not make all installment payments contemplated by the Contingent Compromise.

[6] This assignment was not recorded until November 10, 2015. (Doc. 1-3 at 35.)

[7] This assignment also was not recorded until November 10, 2015. (Doc. 1-3 at 17.)

- 4 -

Contingent Compromise with Citigroup, which indicates that at some point between August 2010 and April 2011 Dreambuilder (or its successor in interest) sold the Loan to Citigroup. But in August 2015, Dreambuilder assigned the Deed of Trust to Trinity, indicating that at some point between April 2011 and August 2015 Dreambuilder reacquired the Loan from Citigroup (or its successor in interest). The record, however, contains no evidence of how Citigroup came to own the Loan, or how Dreambuilder once again came to occupy that role so that it could then transfer it to Trinity in August 2015. For purposes of this order, however, the Court accepts that Trinity acquired ownership and serving rights to the Loan—to the extent any remained—in August 2015. (Doc. 1-3 at 10, 17, 19, 35, 38.)

In December 2017, Plaintiff began the process of refinancing the first mortgage on his home through PNC. At this time, Plaintiff believed that the second mortgage on his home had been satisfied—the Deed of Trust having been released by the Settlement Agreement, and the unsecured obligation to repay the Loan having been discharged through bankruptcy. During the refinancing process, however, PNC informed Plaintiff that the lien from his second mortgage still was held against his home, and that it currently was held by Trinity. (Doc. 1-3 at 4-5.)

In January 2018, Plaintiff contacted Trinity to obtain more information. Trinity notified Plaintiff that it "received the ownership and servicing rights" to the Loan in August 2015, and that as of January 11, 2018 the outstanding amount of the Loan was $28,655. Then, in May 2018, Trinity sent Plaintiff a Settlement Termination Letter explaining that Trinity was terminating the Contingent Compromise because Plaintiff failed to pay the July 1, 2011 installment (and presumably others thereafter, given Plaintiff's admission during the TRO hearing). Citing Paragraph 6 of the Contingent Compromise, Trinity also told Plaintiff that "the terms reverted back to the original terms of the Note and Deed of Trust." Paragraph 6 of the Contingent Compromise, however, does not reference the Deed of Trust, only the Note. (Doc. 1-3 at 5, 20, 38, 40.)

In September 2018, Trinity sent Plaintiff a Notice of Default and Intent to Foreclose, which stated that Plaintiff owed $55,693.26 on the Loan as of September 7, 2018. The following month, Plaintiff sent Trinity a letter disputing that he owed any balance on the Loan. Later that month, Trinity sent Plaintiff a payoff statement reflecting a total payoff amount of $240,431.99. Finally, on October 15, 2018, Defendant MTC Financial Inc., dba Trustee Corps ("Trustee Corps"), in its capacity as trustee for Trinity under the Deed of Trust, noticed a trustee's sale of Plaintiff's home for January 16, 2019. (Doc. 1-3 at 5, 46, 51, 53, 57-58.)

In November 2018, Plaintiff sent letters to Trinity requesting, among other things, an itemized accounting of the Loan history and a copy of the Settlement Agreement referred to in the recitals of the Contingent Compromise. Plaintiff received a partial accounting of the Loan history, reflecting activity since September 11, 2013 only, but no copy of the Settlement Agreement. (Doc. 1-3 at 5-6, 54-55, 63-67.)

**II. Procedural History**

Faced with the prospect that his home might be sold at auction, Plaintiff filed a complaint in Maricopa County Superior Court ("State Court") on December 28, 2018. The complaint names as the defendant "MTC Financial Inc. dba Trustee Corps on behalf of Trinity Financial Services, LLC," and asserts three claims. First, Plaintiff claims that Defendants failed to release the Deed of Trust pursuant to the Settlement Agreement in violation of A.R.S. § 33-707(A), which provides:

> If a mortgagee, trustee or person entitled to payment receives full satisfaction of a mortgage or deed of trust, he shall acknowledge satisfaction of the mortgage or deed of trust by delivering to the person making satisfaction or by recording a sufficient release or satisfaction of mortgage or deed of release and reconveyance of the deed of trust, which release, satisfaction of mortgage or deed of release and reconveyance shall contain the docket and page number or recording number of the mortgage or deed of trust. If a mortgagee, trustee or person entitled to payment receives an amount less than full satisfaction of a mortgage or deed of trust, but has agreed in writing to release the mortgage or deed of trust, the mortgagee, trustee or person shall acknowledge release of the mortgage or deed of trust by delivering to the person making payment of the agreed amount that is less than full satisfaction or by recording a sufficient release of the mortgage or release and

> reconveyance of the deed of trust, which release or release and reconveyance shall contain the docket and page number or recording number of the mortgage or deed of trust. It shall not be necessary for the trustee to join in the acknowledgment or satisfaction, or in the release, satisfaction of mortgage or deed of release and reconveyance. The recorded release or satisfaction of mortgage or deed of release and reconveyance constitutes conclusive evidence of full or partial satisfaction and release of the mortgage or deed of trust in favor of purchasers and encumbrancers for value and without actual notice

Second, Plaintiff claims that Defendants cannot seek to recover the unpaid debt because the applicable statute of limitations for an action on a debt is six years, and Defendants contend that Plaintiff stopped making installment payments on July 1, 2011. Third, Plaintiff claims that Defendants are attempting to collect a debt that was discharged through bankruptcy in violation of 11 U.S.C. § 524. In addition to compensatory damages, Plaintiff requests that the Court "[g]rant a Preliminary Injunction and/or Temporary Restraining Order . . . to keep the Defendants from causing further harm and proceeding any further with the Trustee's Sale of 17251 N. 61st Ave., Glendale, Arizona 85308 on January 16, 2019 at 11:30 AM." (Doc. 1-3 at 2-8.)

On January 3, 2019, the State Court issued an order directing Defendants to appear for a hearing on Plaintiff's TRO request on January 15, 2019 at 9:30 AM. Plaintiff served Trustee Corps with the summons, complaint, and a copy of the State Court's order on January 9, 2019, but did not serve Trinity.[8] Before this hearing could occur, however, Trustee Corps removed the case to this Court on January 11, 2019, invoking the Court's

---

[8] Trustee Corps' position on whether it was properly served is not entirely clear. In its notice of removal, Trustee Corps states "[o]n January 9, 2019, Plaintiff provided (but did not serve) Trustee Corps with a Summons, Civil Complaint . . . , Civil Cover Sheet, Certification of Compulsory Arbitration, and an Order to Appear in the State Court Action." The notice of removal also states that Trustee Corps reserves its right to raise an insufficient service of process defense. In support of its opposition to Plaintiff's TRO request, however, Trustee Corps submitted a declaration from Salina Padilla, a legal assistant who was working at Trustee Corps' office in Irvine, California on the day Plaintiff's process server attempted to serve Trustee Corps. In that declaration, Padilla states only that she declined to accept service on behalf of Trinity; she does not state that she declined to accept service on behalf of Trustee Corps. Moreover, although Trustee Corps argues in its opposition brief that it is not a proper party to this lawsuit, it states that "it is the only entity served" with the complaint. Accordingly, for purposes of this order the Court presumes that Plaintiff properly served Trustee Corps (which is an issue separate from whether Trustee Corps is a proper party). (Doc. 1 at 1-2, 4; Doc. 15 at 1; Doc. 16.)

jurisdiction to hear disputes between citizens of different states where the amount in controversy exceeds $75,000. (Doc. 1; Doc. 1-7; Doc. 16); 28 U.S.C. §§ 1331, 1441, 1446.

On January 14, 2019, the Court issued an order setting a hearing on Plaintiff's TRO request for January 15, 2019 at 2:00 PM. The Court also permitted Trustee Corps to file a written response by no later than noon on the day of the hearing. Trustee Corps timely did so. (Doc. 8; Doc. 15; Doc. 16.)

### III. Legal Standard

The standard for issuing a TRO is identical to the standard for issuing a preliminary injunction. *Whitman v. Hawaiian Tug & Barge Corp./Young Bros., Ltd. Salaried Pension Plan*, 27 F. Supp. 2d 1225, 1228 (D. Haw. 1998). A plaintiff seeking a TRO must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). These elements are balanced on a sliding scale, whereby a stronger showing of one element may offset a weaker showing of another. *See Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131, 1134-35 (9th Cir. 2011). The sliding-scale approach, however, does not relieve the movant of the burden to satisfy all four prongs for the issuance of a TRO. *Id.* at 1135. Instead, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a [TRO], so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the [TRO] is in the public interest." *Id.* at 1135. The movant bears the burden of proof on each element of the test. *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

### IV. Preliminary Issues

At the outset, Trustee Corps argues that the Court must deny Plaintiff's TRO request because Plaintiff did not name Trinity as a defendant and Trustee Corps is an improper defendant for the types of claims Plaintiff asserts. (Doc. 15.) The Court disagrees on the first point and reserves judgment on the second.

- 8 -

### A. Trinity is a Named Defendant

The Court acknowledges that the original complaint names Defendants imprecisely. Literally construed, the complaint names only Trustee Corps *on behalf of* Trinity; it does not explicitly identify Trinity as a defendant in its own right. But Plaintiff is a self-represented litigant, and the pleadings of those proceeding without an attorney must be "liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010); Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). The complaint repeatedly uses the plural "Defendants," indicating that Plaintiff intended to sue more than one entity. Trinity is included in the caption and the complaint's description of the parties, and the factual allegations concerning the trustee's sale center around Plaintiff's communications with Trinity. Fairly read, the complaint adequately identifies Trinity as a separate defendant.

Indeed, Trustee Corps' notice of removal strongly suggests that it, too, understood Trinity to be a party to this lawsuit. For starters, the notice of removal states "Trustee Corps is informed and believes that the only Defendants charged in the action include itself and Trinity. Both Trustee Corps and Trinity are identified in the case caption of the Complaint at this time." Further, Trustee Corps "obtained the consent of Trinity to this removal," which would be required only if Trinity is a defendant. Likewise, Trustee Corps discusses Trinity's citizenship when explaining why this case involves completely diverse parties for purposes of 28 U.S.C. § 1332. (Doc. 1.) Given that Trustee Corps seems to have understood quite well at the time of removal that Trinity is a defendant to this lawsuit, its arguments to the contrary are not well-taken.[9]

---

[9] Notably, Plaintiff also made reasonable efforts to clarify whatever ambiguity might have existed in his original complaint. On January 14, 2019—after this case was removed—Plaintiff filed an amended complaint in State Court that clearly named Trustee Corps and Trinity as separate defendants. During the TRO hearing, the Court directed Plaintiff to promptly file that amended complaint with this Court, which he did. The amended complaint does not deviate substantively from the original: it simply identifies Trustee Corps *and* Trinity as the defendants, rather than Trustee Corps *on behalf of* Trinity. (Doc. 19.) The Court will not elevate form over substance at the expense of justice.

With that said, Plaintiff did not serve Trinity with the summons, complaint, or order setting the TRO hearing. As it pertains to Trinity, then, the Court must treat Plaintiff's complaint as seeking a TRO without notice. Fed. R. Civ. P. 65(b)(1).

**B. Trustee Corps Might be Improperly Joined**

Trustee Corps argues that it should be dismissed from this case pursuant to A.R.S. § 33-807(E), which provides:

> The trustee need only be joined as a party in legal actions pertaining to a breach of the trustee's obligation under this chapter or under the deed of trust. Any order of the court entered against the beneficiary is binding upon the trustee with respect to any actions that the trustee is authorized to take by the trust deed or by this chapter. If the trustee is joined as a party in any other action, the trustee is entitled to be immediately dismissed and to recover costs and reasonable attorney fees from the person joining the trustee.

To qualify for § 33–807(E)'s protections, a trustee must satisfy three elements

> First, that the trustee has been named as a defendant in the claim. Second, that the claim relates to the authority of the trustee to act, given to the trustee either by the trust deed or Arizona statutes regulating trust deeds. Third, that the claims do not allege that the trustee breached any of his or her obligations that arise under either the deed of trust or the statutory chapter of the Arizona Revised Statutes that regulates deeds of trust.

*Puzz v. Chase Home Finance, LLC*, 763 F. Supp. 2d 1116, 1125 (D. Ariz. 2011).

These elements probably are present here. First, Plaintiff has named Trustee Corps as a defendant. Second, the complaint relates (at least in part)[10] to the authority of Trustee Corps to conduct a trustee's sale pursuant to the Deed of Trust. Lastly, Plaintiff has not alleged that Trustee Corps breached any specific obligation under Arizona's deed of trust statutes or under terms of the Deed of Trust itself. Instead, Plaintiff claims that the Deed of Trust is unenforceable because it was released per the terms of the Settlement Agreement between him and Trinity's predecessor in interest, Citigroup (though Citigroup apparently neglected to record a release in the county land records).

---

[10] To the extent parts of the complaint relate to the ability of Defendants to collect on the Loan through means other than a trustee's sale, those claims might not relate to Trustee Corps' authority under the Deed of Trust.

- 10 -

The Court, however, does not need to resolve this issue for purposes of Plaintiff's TRO request and, therefore, will reserve judgment on it. Although at first blush it seems likely that Trustee Corps has been improperly joined to this lawsuit, Trustee Corps' discussion of the issue is relatively short (probably due to the Court's limitation of the response brief to five pages), and Plaintiff has not an opportunity to respond in writing to this argument. Under the circumstances, the Court will await further briefing—either in the context of preliminary injunction briefing or through a motion to dismiss—before determining definitively whether Trustee Corps should be dismissed from this action.

And with that, the Court turns to the merits of Plaintiff's TRO request.

**V. Analysis**

    **A. Likelihood of Success on the Merits**

Plaintiff contends that Defendants cannot conduct a trustee's sale because the Deed of Trust was released pursuant to the Settlement Agreement and therefore neither Trinity nor Trustee Corps has an enforceable right to sell his home, regardless of whether an outstanding amount is due on the Loan (which Plaintiff disputes). In response, Trustee Corps argues that the lien remains valid because Plaintiff defaulted on the payments owed under the Contingent Compromise and, consequently, Trinity exercised its right to terminate the Contingent Compromise and enforce its rights under the original Note. But Trustee Corps' argument makes sense only if termination of the Contingent Compromise also terminated the Settlement Agreement. Nothing in the Contingent Compromise indicates that this would be the case.

To the contrary, the Contingent Compromise distinguishes the two settlements. For example, the Contingent Compromise refers to itself as the "Agreement" and to the April 12, 2011 settlement releasing the lien as the "Settlement Agreement," and the recitals make clear that these are two separate agreements addressing two different matters. The Settlement Agreement released the lien, which was "memorialized in a Deed of Trust," while the Contingent Compromise set a payment schedule for satisfying the past due balance on the Loan, which was memorialized in the Note. Moreover, paragraph 6 of the

Contingent Compromise states that, if Plaintiff failed to timely make the installment payments to settle the outstanding Loan balance, the lender could terminate the "Agreement"—meaning the Contingent Compromise—and pursue its remedies under "the terms and conditions of the Note as if this Agreement had never existed." Nothing in paragraph 6, however, says that the lender may terminate the *Settlement Agreement* or pursue remedies under *the Deed of Trust*. (Doc. 1-3 at 19-20.)

Of course, the Court's current impressions are preliminary and subject to change based on further factual and legal developments. The record certainly has holes, the most glaring of which is the absence of a copy of the Settlement Agreement. It might be that the Settlement Agreement provided for the release of the Deed of Trust only after Plaintiff satisfied his obligations under the Contingent Compromise, and that the recitals in the Contingent Compromise imprecisely describe the Settlement Agreement by saying that the lien had already been released. But the plain language of the Contingent Compromise and evidence that major credit reporting agencies reported the Loan as an unsecured debt as of December 2018 creates enough doubt about the enforceability of the Deed of Trust to justify hitting the pause button on any trustee's sale pending a more through airing of the facts and law. For these reasons, the Court finds that Plaintiff has shown, at the very least, that serious questions going to the merits of his claims exist.[11]

### B. Irreparable Harm, Balance of Hardships, and the Public Interest

The Court has no difficulty concluding that Plaintiff has carried his burden on the remaining three prongs on the TRO test. Without a TRO, Plaintiff risks losing his home. A person's home is unique, carries sentimental value, and its loss certainly is irreparable. Moreover, pursuant to A.R.S. § 33-811(C), Plaintiff will be deemed to have waived any

---

[11] The Court declines at this stage to address the parties' arguments concerning the statute of limitations. The enforceability of the Deed of Trust is dubious, and there are serious questions about whether the underlying Loan became unsecured as of April 12, 2011. If the Loan became an unsecured debt at this point, then the statute of limitations argument probably would go only to Defendants' ability to collect on the Loan through means other than a trustee's sale (the same is true for Plaintiff's claim that efforts to collect on the Loan violate his Chapter 7 bankruptcy discharge). But Plaintiff asks only that the Court temporarily enjoin the trustee's sale of the home, and the analysis above provides a sufficient basis for doing so.

objections to the trustee's sale if he does not obtain injunctive relief prior to 5:00 PM on the last business day before the sale—here, January 15, 2019.

The balance of hardships also tips sharply in Plaintiff's favor. Although Defendants would be harmed by a TRO because they will be unable, at least for the time being, to satisfy the outstanding Loan balance through sale of the collateral (assuming those rights still exist), the harm is minimal and fleeting when compared to the harm Plaintiff will suffer if his home is sold. According to Trustee Corps, Plaintiff has been in default on his Loan since July 2011. Trinity appears to have acquired the Loan in August 2015. Yet for years afterward Defendants made no efforts to foreclose. A little more delay won't hurt.

Finally, although public policy favors clarity and certainty in land records, and trustee's sales in Arizona are meant to proceed expeditiously outside the judicial process, *Hogan*, 277 P.3d at 784, the public interest also is served by allowing homeowners with tenable claims to pursue their remedies before losing their homes. Indeed, the harsh consequences of § 33-811(C) magnify the importance of affording a homeowner with a reasonable claim the opportunity to make his case before a trustee's sale commences.

### C. Other Requirements

Federal Rule of Civil Procedure 65 places additional requirements on TROs issued without notice.[12]

First, Plaintiff must show that immediate and irreparable injury will result if he does not obtain a TRO before Trinity can be heard. Fed. R. Civ. P. 65(b)(1)(A). Plaintiff has satisfied this requirement. As explained above, the trustee's sale was scheduled to occur on January 16, 2019, and without a court order enjoining the sale Plaintiff would be deemed under Arizona law to have waived his objections to it. Immediate, irreparable injury therefore would occur if the Court waited until Trinity could be heard before issuing a ruling.

---

[12] The TRO is not without notice to Trustee Corps, but it seems probable that Trustee Corps has been improperly joined to this action. Although Trinity probably has received actual notice of this lawsuit, given that it consented to removal, it has not been served with legal process. Accordingly, the TRO must be treated as a TRO without notice as to Trinity.

Next, Plaintiff must detail his efforts to notify Trinity and explain why notice should not be required. Fed. R. Civ. P. 65(b)(1)(B). The Court finds Plaintiff has adequately done so, albeit not as formally as Rule 65 might contemplate. Plaintiff filed his lawsuit in State Court at the end of December and, after the State Court set a hearing on the TRO request, served Trustee Corps with copies of the relevant documents. Once Plaintiff learned that his complaint was somewhat ambiguous as to whether Trinity was a separate defendant, he made reasonable efforts to amend his complaint and to serve Trinity. During the TRO hearing, Plaintiff informed the Court that service on Trinity was in progress. The Court is satisfied both that Plaintiff has made reasonably diligent efforts to name and serve Trinity, and that notice should not be required, given both the irreparable harm that would result from denying the TRO request and the fact that the trustee under the Deed of Trust had an opportunity to appear and respond.

Lastly, the Court may issue a TRO only if the movant posts security in an amount the Court considers proper. Fed. R. Civ. P. 65(c). The Court finds that $200 is adequate to secure the TRO Plaintiff seeks. Accordingly, Plaintiff is required to post a cash bond of $200 with the Clerk of the Court by no later than January 24, 2019.

**VI. Conclusion**

Accordingly, for these reasons—and as stated on the record during the January 15, 2019 hearing—the Court finds that Plaintiff satisfies all requirements for obtaining a TRO.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**IT IS ORDERED** that Plaintiff's application for a TRO (Doc. 1-3) is **GRANTED** as follows:

1. Defendants, their agents, and anyone acting in concert or at their direction are **ENJOINED** from conducting a trustee's sale of the properly located at **17251 N. 61st Avenue, Glendale, AZ 85308**.
2. By no later than **January 24, 2019**, Plaintiff shall post a cash bond in the amount of **$200** with the Clerk of the Court.
3. By no later than **January 16, 2019**, Plaintiff shall file his amended complaint.[13]
4. Plaintiff shall serve Trinity by no later than **January 24, 2019**, and file proof thereof with the Court.
5. The parties shall appear for a status conference on **January 24, 2019**, at 4:00 PM in Courtroom 606, 401 West Washington Street, Phoenix, AZ 85003 before Judge Douglas L Rayes. Out-of-state counsel may appear via telephone by calling the Court's judicial assistant, Mary Farmer, at 602-322-7530. Parties appearing telephonically must do so via landline only. The use of cellular telephones will not be permitted. The parties shall come to the conference prepared to discuss the following: (1) a schedule for briefing whether the Court should convert the TRO to a preliminary injunction, (2) a date and time for a preliminary injunction hearing, (3) whether any discovery will be needed to prepare for the preliminary injunction hearing, and (4) whether the resolution of Plaintiff's preliminary injunction request will require an evidentiary hearing or whether it can be resolved on the briefs and oral arguments alone.
6. Federal Rule of Civil Procedure 65(b)(2) provides that a TRO may extend for a period of up to fourteen days unless, before that time, the Court for good cause extends the period. The Court issued this TRO via a minute entry on January 15, 2019, with a written order to follow. Accordingly, this TRO will expire on **January 30, 2019**, unless, before then, the Court extends the period to

---

[13] Plaintiff has since satisfied this requirement. (Doc. 19.)

accommodate the briefing and hearing schedule on Plaintiff's request for a preliminary injunction.[14]

Dated this 18th day of January, 2019.

Douglas L. Rayes
United States District Judge

---

[14] The Court's January 15, 2019 minute entry enjoined the trustee's sale "until further order of the Court." (Doc. 17.) The Court now clarifies, consistent with Rule 65(b)(2), that the trustee's sale is enjoined until January 30, 2019, unless before then the Court extends the TRO past that date.

On January 16, 2019, Plaintiff filed a Motion to Compel/Motion for Sanctions, in which he claims that Defendants rescheduled the trustee's sale for January 25, 2019, and argues that this rescheduling conflicts with the TRO's "until further order of the Court" language. The Court will not rule on Plaintiff's motion for sanctions at this time because it is not fully briefed, but Defendants should be cautious about rescheduling a trustee's sale before this TRO has officially dissolved. The Court is inclined to extend the duration of the TRO if the parties cannot adequately prepare and appear for a preliminary injunction hearing before January 30, 2019.